MINUTES

MEDICAID RATE ADVISORY COMMISSION

June 25, 2001

1. CALL TO ORDER

   The meeting was called to order at 11:35 a.m. by Debra Pohlman, acting chair, at the conference room, Health Facilities Licensing and Certification Office, Anchorage, AK.

2. ATTENDANCE

   Commission members present: Debra Pohlman and Nancy Cornwell

   Staff present: Jack Nielson, Randall Schlapia, Neal Kutchins, Barbara Hillin, Denise Hand.

3. PROPOSAL: Debra Pohlman presented a proposal that, because there were only 2 commission members present, the material would be presented and discussed. Commission members may ask questions and make individual recommendations but no formal commission recommendation would be made, since there was not a quorum. There were no objections to this proposal.

4. ELECTION OF OFFICERS: Tabled due to lack of quorum.

5. APPROVAL OF MINUTES: Debra Pohlman recommended approval of minutes of the December 15, 2000 Medicaid Rate Advisory Commission meeting. Minutes were not officially approved because of lack of quorum, but no comments were made regarding changes.

6. OLD BUSINESS

   Jack Nielson stated that, during the last meeting, the commission had some questions about the timeliness of receipt of Medicare cost reports and Medicaid forms from the facilities. Nancy Cornwell also expressed her dismay at the lateness of the reports to the staff.

Comments and Discussion

7. DISPROPORTIONATE SHARE HOSPITAL CALCULATIONS

Jack Nielson stated the DSH calculation for the commission's review is the DSH calculation under the current DSH regulations. One of the pieces of our current regulations is that in order to qualify for additional payments as DSH the hospital must meet certain criteria. One way to begin the qualification process is to have Alaska Medicaid inpatient utilization rate at least one standard deviation above the mean of Alaska Medicaid inpatient utilization rates for all hospitals in the state. This calculation is for facilities whose fiscal years began during the next state fiscal year. That would be around July 1st, 2001 through June 30, 2002. We have 2 facilities whose percentage Medicaid utilization is over one standard deviation above the mean. Those facilities were Charter North and Valdez Community Hospital. Under the old system we don't set these facilities' rates until the next meeting and the meeting after so that's when we would really be dealing with the calculation for the individual facility. This is the overall calculation that we're presenting today and it's the same format that we've used for years. It just has new numbers in it. He stated that the new regulations should be effective around October 1st.

No questions or comments.

8. INFORMAL RATE HEARINGS

    a. Charter North - FY 01

        Randall Schlapia - The first four rates will be the ones that are on the old rate setting before the new system that we just started, January 1. The first four are temporary rates. Mr. Schlapia read a letter from Charter North requesting a temporary rate. Therefore, in accordance with 7 AAC 43.673(b) and 7AAC 43.701, staff will recommend a continuance of the current temporary rate of 32.39% of charges for the period commencing July 1, 2001 to no later than September 30, 2001.

        Facility representative was not present.

        Debra Pohlman - Commission members had no further suggestions.

        Nancy Cornwell concurred with staff's recommendation.

    b. Norton Sound Regional Hospital - FY 2000

        Facility was represented by John Sullivan from the law firm of Inslee, Best, Doezie & Ryder, and Donna Herbert of Financial Consultants of Alaska.

Randall Schlapia presented staff's recommendation to establish the per day adjusted admission for Norton Sound Regional Hospital at 51.63% consisting of 73.93% in accordance with 7AAC 43.685(f) and a negative 22.30% adjustment in accordance with 7AAC 43.691 effective for the period commencing October 1, 1999 through no later than September 30, 2000. Alternatively establish the rates for adjusted admission at 73.93% of charges in accordance with 7 AAC 43.685(f) if the facility pays the Division of Medical Assistance the year-end conformance amount of $186,115.00 in accordance with 7AAC 43.691(a)(2), effective for the period commencing October 1, 1999 through no later than September 30, 2000. Establish the maximum aggregate average charge for the Medicaid program at $5,637.53 per adjusted admission. Further establish the rate per day for long term care services at $477.13 consisting of $443.26 for routine service in accordance with 7 AAC 43.685(f), $36.23 for capital, $10.96 for ancillary and a negative adjustment of $13.32 in accordance with 7 AAC 43.691, effective for the period commencing October 1, 1999 through no later than September 30, 2000.

Debra Pohlman - No questions from the commission.

Donna Herbert stated that Norton Sound disagrees with the proposed 2000 rate for acute care of 51.6%. The '97 Medicaid audit which is the base year for this 2000 rate included an adjustment number 8 which caused an over allocation of overhead costs to a nonreimbursable area. Norton Sound has delivered a lot of IHS grants, has a lot of nonreimbursable grants. The issue here is that the administration and general departments deemed by the auditors to be related only to IHS were directly assigned to the nonreimbursable cost centers. And then the A&G from the hospital was stepped down over and above those allocations, which causes a double allocation to the nonreimbursable areas. The result of this picking and choosing is that the nonreimbursable cost centers receive 100% of the overhead relating to IHS plus an allocation of the hospital overhead departments. It is proper for reimbursable cost centers to receive an allocation of nonreimbursable overheads to compensate for the fact that the nonreimbursable cost centers receive an allocation. This issue was brought up at one of the Medicare training classes that MRAC put on in July of '99 and the instructor was asked if this type of allocation would be proper. They quickly said that this would be punitive to the facility and would not be the way to handle overhead costs on nonreimbursable areas. The effect of reversing that adjustment increases both the acute care rate and the long term care rate. In addition it reduces the acute care year-end conformance cost method from 10.66 to 8.41 per cent. Norton Sound's acute care rates have averaged 90% of charges for the past 10 years. The facility's cost to charge ratio in the base year was 89.97%, however for the 2000 rate which uses '97 base it's being cost contained down to 73.90%. It's a cost containment of nearly 16%. The facility's rate is being set from the current year approved side or FY '99 rate inflation. The '99 approved ratio was the lowest approved charge the facility had ever encountered. FY '99 was an atypical year with patients with low acuity. The facility ran on the base year side of the "F" calculation. The

acute care charges dropped from that year by approximately 175,000 while the admissions remained constant.

Donna distributed a worksheet to show what '99 looked like compared to the other years and continued to explain acuity rates.

The facility requests that the commission find manifest injustice and waive the acute care year-end conformance adjustment of 22.30% down to the cost method of 8.41%. The commission has done this in the past.

John Sullivan addressed the long-term care portion of the rate involving respiratory therapy charges.

Donna Herbert said in summary they're asking for 3 things on this rate: that the acute care year-end conformance of 22.3% be waived down to the cost method of 8.41 and that manifest injustice does exist for taking care of Medicaid patients with long lengths of stay; that the long-term care rate be stated at $501.05; and a complete waiver of the long term care ancillary year-end conformance

Questions and discussion.

Randall Schlapia stated that what has been presented is some outlier information and as in the past, for many years now, staff has been quite a bit reluctant to use that kind of information because it only looks at the high end without taking a look at the average of the overall acuity or it doesn't look at the low end. It just scopes at the high end and we don't think that's reflective, necessarily, of an average acuity, which is what the rate setting system uses. What we have used in the past has been length of stay increases or decreases. And recently in the last year or two, we have used the Myers and Stauffer report information about case mix index. In this case, from '95 to '97, which are the two years we're concerned with, the length of stay dropped from 3.3 on average to 2.7, which indicates not an increase, but a decrease in acuity. The Myers and Stauffer case mix index also decreased. To say that the year-end conformance was created by an increase in acuity is not apparent to us at the moment. It's not manifest. The decrease is specific to this institution.

Mr. Schlapia continued to explain the respiratory therapy and whether it is a billable service.

Questions and comments.

Nancy Cornwell supported staff's recommendations.

Debra Pohlman had no opinion to offer at this time, due to lack of quorum.